**2025 WI 27**

# Supreme Court of Wisconsin



WISCONSIN STATE LEGISLATURE,
*Plaintiff-Counterclaim Defendant, Respondent-Cross Appellant,*

*v.*

WISCONSIN DEPARTMENT OF PUBLIC INSTRUCTION, et al.,
*Defendants-Counterclaim Plaintiffs, Appellants-Cross Respondents.*

No. 2024AP1713
Decided June 25, 2025

APPEAL from a judgment and order of the Dane County Circuit Court (Stephen E. Ehlke, J.) No. 2024CV1127

REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court.

¶1     REBECCA GRASSL BRADLEY, J.   "[P]ower is of an encroaching nature, and . . . it ought to be effectually restrained from passing the limits assigned to it." THE FEDERALIST NO. 48, at 332 (James Madison) (J. Cooke ed., 1961). The legislature contends the governor exceeded the scope of his partial veto power under Article V, Section 10(1)(b) of the Wisconsin Constitution. The governor and the Wisconsin Department of Public Instruction (DPI) argue the legislature's Joint Committee on Finance (JCF) improperly refused to grant DPI's request for funds appropriated to JCF's supplemental funding account. The Dane County Circuit Court granted summary judgment in part for each party. The court concluded the governor did not exceed his constitutional boundaries in partially vetoing a bill and JCF did not improperly withhold funds from DPI. The Wisconsin

Constitution, however, does not authorize the governor to partially veto a non-appropriation bill, which the governor may veto only in its entirety. We hold the governor breached his constitutional boundaries because the bill he partially vetoed was not an appropriation bill. We also hold JCF did not improperly withhold funds the legislature appropriated to JCF. Accordingly, we affirm in part and reverse in part the circuit court's summary judgment order.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶2      The state's biennial budget bill for the 2023–25 biennium, 2023 Wis. Act 19, was published on July 6, 2023. Act 19 appropriated more than $250 million to JCF's supplemental funding account under WIS. STAT. § 20.865(4).[1] Of these funds, JCF earmarked $50 million to support future literacy programs.[2] Although it accompanies the budget bill, this earmark is not enacted law.[3] Act 19 also appropriated money directly to DPI.

¶3      Two weeks after Act 19 became law, 2023 Wis. Act 20 was enacted and published. Act 20 created an "Office of Literacy" and established two new literacy programs. The first program authorizes the newly created Office of Literacy to contract with and train literacy coaches for placement in schools. 2023 Wis. Act 20, § 8. The second program

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

[2] Joint Committee on Finance, Motion 103 (June 13, 2023) (electronic copy available                                            at https://docs.legis.wisconsin.gov/misc/lfb/jfcmotions/2023/2023_06_13/001_depart ment_of_public_instruction/motion_103_omnibus_motion); *see also* Wis. Legislative Fiscal Bureau (LFB), 2023–25 Wis. State Budget, *Summary of Provisions* 234–35      (July      2023)      (electronic      copy      available      at https://docs.legis.wisconsin.gov/misc/lfb/budget/2023_25_biennial_budget/102_s ummary_of_provisions_2023_act_19_july_2023_entire_document.pdf).

[3] Richard A. Champagne & Madeline Kasper, *Wisconsin Executive Budget Bills, 1931–2023*, 8 LRB REPS., no. 8, Aug. 2023, at 2 (explaining accompanying budget documents "are not law but [] do capture the intentions of the governor and the legislature in budget deliberations") (electronic copy available at https://docs.legis.wisconsin.gov/misc/lrb/lrb_reports/executive_budget_bills_202 3_7_8.pdf).

requires DPI to use grants for reimbursing schools that implement approved literacy curricula. *Id.*, § 12. This grant program provides grants to "school boards, operators of charter schools, and governing bodies of private schools participating in" certain programs in "an amount equal to one-half of the costs of purchasing the literacy curriculum and instructional materials" from a list of approved programs. 2023 Wis. Act 20, § 12. Act 20 did not appropriate funds for either program.

¶4 Just over six months later on January 26, 2024, the senate introduced 2023 S.B. 971 and the assembly introduced 2023 A.B. 1017 (collectively, S.B. 971), which were published as 2023 Wis. Act 100 on March 1, 2024. Senate Bill 971 created an account for each of the two literacy programs established under Act 20. It did not, however, appropriate or transfer any money to those accounts. Although S.B. 971 passed in both houses, neither the senate nor assembly put the matter to "yeas and nays" and no such record was entered in the Journal for either house. The governor partially vetoed and then signed S.B. 971, which became 2023 Wis. Act 100.

¶5 The partially vetoed version consolidated the two funding accounts into one account that could be used by DPI to fund broad literacy initiatives, without specifying the literacy coaching program or the grant program.[4] To accomplish this policy change, the governor first struck portions of § 1:

> 20.005(3) (schedule) of the statutes: at the appropriate place, insert the following amounts for the purposes indicated:
>
> |  | 2023–24 | 2024-25 |
> |---|---|---|
> | 20.255 Public instruction, department of | | |
> | (1) EDUCATIONAL LEADERSHIP | | |
> | (fc) Office of literacy; | | |
> | literacy ~~coaching~~ program  GPR C | -0- | -0- |
> | (2) AIDS FOR LOCAL EDUCATIONAL PROGRAMMING | | |

---

[4] Governor's Veto Message: 2023 Wisconsin Act 100 (Feb. 29, 2024) (electronic copy available at https://docs.legis.wisconsin.gov/2023/related/veto_messages/2023_wisconsin_act_100.pdf).

> (fc) Early literacy initiatives;
> support                                      GPR B            0            0

2023 Wis. Act 100, § 1. Next, the governor struck references to the literacy coaching program from § 2:

> 20.55(1)(fc) *Office of literacy; literacy coaching program*. As a continuing appropriation, the amounts in the schedule for the office of literacy and the literacy coaching program under s. 115.39.

2023 Wis. Act 100, § 2. The governor also struck § 4 in full:

> 20.255(2)(fc) *Early literacy initiatives; support.* Biennially, the amounts in the scheduled for grants under s. 118.015(1m)(c) and for financial assistance paid to school boards and charter schools for compliance with 2023 Wisconsin Act 20, section 27(2)(a).

2023 Wis. Act. 100, § 4. Finally, the governor struck § 3 and § 5, which sunset the spending authority for § 2 on July 1, 2028. In sum, under the partially vetoed version, DPI is not required to use funds the legislature allocated for literacy programs created by Act 20 on those particular programs. Instead, DPI may spend funds allocated for its Office of Literacy on any "literacy program," with no sunset provision.

¶6    Shortly after Act 19 became law and at DPI's request, JCF supplemented DPI's own appropriation with $327,400 of the $50 million earmarked for literacy programs. DPI later asked JCF for the remainder of the funds set aside in the Act 19 biennial budget—$49,672,600—in accordance with Act 100. JCF denied that request because it considered the governor's veto of Act 100 unconstitutional and therefore invalid.

¶7    The legislature filed suit in circuit court, seeking a declaration that the governor's partial veto of S.B. 971 was unconstitutional because it was not an appropriation bill. The legislature argued S.B. 971, as passed by the legislature, should be in full force and effect. Alternatively, the legislature argued that even if S.B. 971 were an appropriation bill when presented to the governor for signature, the governor exceeded his partial veto authority by changing the bill into something other than what passed the legislature.

¶8    DPI and the governor counterclaimed, asserting JCF improperly withheld the remainder of the $50 million from DPI. According

to DPI and the governor, JCF has discretion only over money intended to supplement agency appropriations due to "unforeseen emergencies" or similar circumstances and not money set aside in the biennial budget for a specific purpose the legislature plainly foresaw. In the alternative, DPI and the governor argued that separation of powers principles under the Wisconsin Constitution prevent the legislature from "exercising a legislative veto over the crediting of already-appropriated money to its intended executive branch recipient."

¶9      Both sides filed cross motions for summary judgment. The circuit court granted and denied each motion in part. Addressing the legislature's claims, the court held S.B. 971 was an appropriation bill subject to the governor's partial veto authority. It reasoned that Acts 19, 20, and 100 "although passed sequentially, were really part of one piece of legislation." The court explained, when viewing "Act 19 and Act 100 in tandem . . . [S.B. 971] is an 'appropriation bill' because it allows for the transfer of money to DPI to fund various programs created under Act 20." In essence, the court considered the creation of the literacy program (Act 20) funded by money appropriated to JCF (Act 19) to be transferred by JCF into accounts (Act 100) as a unitary enactment.

¶10      The circuit court also rejected the legislature's alternative argument that even if S.B. 971 were an appropriation bill, the governor exceeded his partial veto authority. It reasoned that this court's per curiam opinion in *Bartlett v. Evers*, 2020 WI 68, 393 Wis. 2d 172, 945 N.W.2d 685 (per curiam), was non-precedential and, quoting *State ex rel. Wis. Tel. Co. v. Henry*, 218 Wis. 302, 316, 260 N.W. 486 (1935), determined that the governor's partial veto passed constitutional muster because it left behind "a complete, consistent, and workable scheme and law."

¶11      In response to the counterclaim of the governor and DPI that DPI should receive the $50 million appropriated to JCF, the circuit court held that Act 19 "plain[ly] on its face . . . appropriate[d] over $250 million to JCF's supplemental-funding account for the purpose of JCF's providing supplemental funding to governmental units under [WIS. STAT.] § 13.101(3)." The court further noted that "[f]or whatever reason, the Governor chose to approve Act 19 as submitted to him for approval." Because the legislature appropriated the money to JCF and not DPI, the court denied the governor and DPI relief.

¶12      The circuit court rejected the executive branch's contention that giving JCF the discretion to disburse the $50 million was an

unconstitutional delegation of legislative power. Understanding the executive branch's argument to be a facial challenge to the constitutionality of WIS. STAT. § 13.101(3), the court described the limited circumstances under which JCF may disburse funds from its supplemental funding account in accordance with § 13.101(3), and determined that the statute provided "for enough interaction between the executive and legislative branches to pass constitutional muster." Ultimately, the court described "DPI's disappointment" in not receiving the $50 million as "a political, not legal, problem."

¶13　Based on its conclusion that S.B. 971 was an appropriation bill subject to the governor's partial veto, the circuit court granted summary judgment in favor of the governor and DPI on the legislature's claim. With respect to the executive branch's counterclaim, the court granted summary judgment in favor of the legislature, concluding DPI is not entitled to the $50 million because the legislature properly appropriated the money to JCF for disbursement under WIS. STAT. § 13.101(3). Under the court's order, Act 100—as partially vetoed—is the law, but the accounts it created to fund Act 20 literacy programs remain empty.

¶14　Both sides appealed. The governor and DPI filed a petition for bypass with this court, which we granted. We hold S.B. 971 was not an appropriation bill subject to the governor's partial veto and DPI is not entitled to receive the $50 million appropriated to JCF. The circuit court is therefore affirmed in part and reversed in part.

## II.  STANDARD OF REVIEW

¶15　This case comes before us after the circuit court granted summary judgment, and presents issues of constitutional and statutory interpretation, which we review de novo. *Evers v. Marklein*, 2024 WI 31, ¶8, 412 Wis. 2d 525, 8 N.W.3d 395. This court "independently reviews a grant of summary judgment using the same methodology as the circuit court." *Wis. Prop. Taxpayers, Inc. v. Town of Buchanan*, 2023 WI 58, ¶8, 408 Wis. 2d 287, 992 N.W.2d 100 (quoting *Kemper Indep. Ins. Co. v. Islami*, 2021 WI 53, ¶13, 397 Wis. 2d 394, 959 N.W.2d 912). "Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Id.,* ¶8 (quoting *Islami*, 397 Wis. 2d 394, ¶13).

## III.  ANALYSIS

### A.  THE PARTIAL VETO OF ACT 100

¶16    The governor partially vetoed S.B. 971 and modified substantive portions of its policies. The governor and DPI maintain S.B. 971 was an "appropriation bill" and was therefore subject to the governor's partial veto authority. The circuit court agreed with the executive branch. We disagree and hold that S.B. 971 was not an appropriation bill.

¶17    The Wisconsin Constitution originally provided the governor with the authority to sign or veto bills in their entirety. Article V, Section 10 of the Wisconsin Constitution originally read, in relevant part, as follows:

> Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large upon the journal, and proceed to reconsider it . . . . If any bill shall not be returned by the governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law . . . .

WIS. CONST. ART. V, § 10 (amended 1908). The constitution was amended in 1908, changing the three-day window to six days. JACK STARK & STEVE MILLER, THE WISCONSIN STATE CONSTITUTION 161 (2d ed. 2019). In 1930, the constitution was again amended to give the governor partial veto authority, but only with respect to "[a]ppropriation bills," which "may be approved in whole or in part by the governor, and the part approved shall become law." *Id.*; WIS. CONST. ART. V, § 10(1)(b). In 1990, the constitution was amended again to prohibit the governor from using the partial veto authority to "create a new word by rejecting individual letters[,]" or "create a new sentence by combining parts of 2 or more sentences . . . ." STARK & MILLER, *supra*, at 160–61 (quoting WIS. CONST. ART. V, § 10(1)(c)). The provision authorizing the governor to approve appropriation bills "in whole or in part" is the subject of this dispute. The relevant language has remained unchanged since 1930.[5]

---

[5] The partial veto language appeared in 1927 Senate Joint Resolution 35, 1927 Enrolled Joint Resolution 37, 1929 Senate Joint Resolution 40, and 1929 Enrolled Joint Resolution 43, and provided as follows: "[a]ppropriation bills may

¶18 We first explored the original meaning of an "appropriation bill" six years after the people of Wisconsin gave the governor partial veto authority. In *State ex rel. Finnegan v. Dammann*, 220 Wis. 143, 264 N.W. 622 (1936), the governor vetoed in part a bill related to the "regulation and taxation of motor carriers." *Id.* at 144. While the bill "concededly did not contain any express appropriation[,]" the governor attempted to veto portions related to permit fees on the basis that the vetoed language amended an appropriation statute, which the governor argued rendered the bill an "appropriation." *Id.* at 147. We disagreed. In order to qualify as an "appropriation bill," we held it must contain an appropriation within its four corners, which we later called the "four corners rule." *Id.* at 147–48.

¶19 The court considered several definitions before reaching that conclusion. One contemporaneous dictionary defined an appropriation bill as "[a] measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditure." *Id.* at 148 (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY (1934)). We also considered definitions adopted by courts in other states. For example, in *State v. La Grave*, 23 Nev. 25, 41 P. 1075, 62 Am.St.Rep. 764 (1895), the Nevada Supreme Court concluded, "[a]n appropriation in the sense of the constitution means the setting apart a portion of the public funds for a public purpose." *Finnegan*, 220 Wis. at 148 (citing *La Grave*, 41 P. at 1076). In *Hunt v. Callaghan*, 32 Ariz. 235, 257 P. 648 (1927), the Arizona Supreme Court determined "[a]n appropriation is 'the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other.'" *Finnegan*, 220 Wis. at 148 (citing *Hunt*, 257 P. at 649).

be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills." *See Bartlett v. Evers*, 2020 WI 68, ¶¶30–33, 393 Wis. 2d 172, 945 N.W.2d 685 (Roggensack, C.J., concurring in part and dissenting in part) (citation omitted); *see also* Richard A. Champagne et. al., *The Wisconsin Governor's Partial Veto*, 4 READING THE CONST., no. 1, June 2020, at 5–9. Legislative Reference Bureau 4 (June 2019), 5–9. The current text, in relevant part, reads: "If the governor approves and signs [a] bill, the bill shall become law. Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law." WIS. CONST. ART. V, § 10(1)(b).

¶20    Applying these definitions, the court determined "the constitutional amendment deals with appropriation *bills*" so "the bill itself must satisfy the constitutional requisites." *Finnegan*, 220 Wis. at 148. A bill having merely "an indirect bearing upon the appropriation of public moneys" does not qualify as an appropriation bill within the original meaning of Article V, Section 10(1)(b) of the Wisconsin Constitution. *Id.* The court construed "appropriation bill" as it was understood at the time the amendment was adopted, as reflected "in common speech or in the language of those who deal with legislative or governmental matters." *Id.* at 149. Because the bill in that case dealt "with appropriations neither in the title nor in the body of the act" it "would not be considered such a bill" under either vernacular. *Id.*

¶21    To classify bills that only indirectly affect appropriations as appropriation bills would "extend the scope of the constitutional amendment far beyond the evils it was designed to correct." *Id.* at 148. We later described "[t]he evil" the constitutional amendment was designed to fix as "the practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits." *Risser v. Klauser,* 207 Wis. 2d 176, 197 n.16, 558 N.W.2d 108 (1997) (citation omitted); *see also Bartlett*, 393 Wis. 2d 172, ¶184 (Kelly, J., concurring in part and dissenting in part); *see generally LeMieux v. Evers*, 2025 WI 12, ¶¶60–63, 415 Wis. 2d 422, 19 N.W.3d 76 (Hagedorn, J., dissenting) (reviewing the history of "logrolling" and the 1930 constitutional amendment). A bill does not constitute an appropriation bill within the meaning of the constitution "merely because its operation and effect in connection with an existing appropriation law has an indirect bearing upon the appropriation of public moneys." *Finnegan*, 220 Wis. at 148.

¶22    We addressed the same question in *State ex rel. Kleczka v. Conta*, 82 Wis. 2d 679, 264 N.W.2d 539 (1978), in which the challenged bill allowed individuals to designate on their tax returns an increase of $1 in their tax liability for deposit into the Wisconsin Election Campaign Fund. *Id.* at 688–89. The governor partially vetoed the bill to give taxpayers the option to designate the sum of $1 from the state general fund instead. *Id*. Applying *Finnegan*, we concluded the bill was an appropriation bill because it "authorized the expenditure of public moneys. The bill set apart a portion of the public funds for a public purpose—the financing of election campaigns." *Id*. *Kleczka* reaffirmed *Finnegan*'s interpretation that an appropriation bill must, within its four corners, set aside public funds for a public purpose.

¶23     The court had another opportunity to clarify the meaning of "appropriation" in *Risser,* 207 Wis. 2d 176. In that case, the governor struck certain dollar amounts and wrote in lower figures in two separate sentences. The first dealt with the building commission's authority to contract for the sale of revenue obligations, and the second raised the cumulative limit on revenue obligations subject to sale under the statute. Although the parties conceded the partially vetoed bill was an "appropriation *bill,*" they disagreed on whether the amount modified by the governor was an "appropriation." Applying this court's holding in *Citizens Utility Board. v. Klauser*, 194 Wis. 2d 484, 534 N.W.2d 608 (1995), the *Risser* court concluded the "write-in veto" exercised by the governor "may be exercised only on a monetary figure which is an appropriation amount." 207 Wis. 2d at 180–81. Affirming the four corners rule from *Finnegan*, the court held the portion the governor struck was not an appropriation and therefore not subject to his write-in veto. *Id*. at 182, 202–03.

¶24     The *Risser* court concluded the section struck did not meet the definition of "appropriation" as "an expenditure or setting aside of public funds for a particular purpose." *Id*. at 192–93. The statute governed the "level of funds that the state is authorized to generate by the sale of bonds and limits the purpose for which the revenue raised may be expended." *Id*. at 193. The court observed that the sale of bonds is "revenue raising; revenue raising and appropriation are more nearly antonyms than synonyms." *Id*. (citations omitted). The court also emphasized the benefit of a "bright line rule" governing disputes between the political branches "to preclude continuing judicial involvement in and the need for frequent judicial resolution of inter-branch disputes." *Id.* at 202. Ultimately, the court rejected the governor's more "expansive reading" of the partial veto power because "much, if not all, legislation can affect and be interrelated with the appropriation of money" wrongly rendering "[m]uch, if not all, legislation . . . susceptible to the partial veto[.]" *Id*. at 201–02.

¶25     Precedent has consistently held that a bill's interaction with, interplay between, or indirect bearing on an appropriation bill cannot transform a non-appropriation bill into an appropriation bill. To qualify as an appropriation bill, a bill must set aside public funds for a public purpose within its four corners. In exercising the partial veto power, the governor uses a "small piece of power that naturally belongs in one branch [that the framers] put [] in another," *Bartlett*, 393 Wis. 2d 172, ¶186 (Kelly, J., concurring in part and dissenting in part). This court's longstanding definition of "appropriation bill" confines the executive branch's exercise of that limited power to its constitutional boundaries. *See Flynn v. Dep't of*

*Admin.*, 216 Wis. 2d 521, 542, 576 N.W.2d 245 (1998) ("The definition of 'appropriation' in *Finnegan* . . . do[es] not constrain the legislative, but rather the executive branch.").

¶26    Turning to the bill at issue in this case, the text of S.B. 971 did not set aside public funds for a public purpose; therefore, S.B. 971 was not an appropriation bill. Instead, S.B. 971 created accounts into which money could be transferred to fund the programs established under Act 19 and Act 20, and it changed other aspects of the "literacy coaching program." The bill, however, does not set aside any public funds; in fact, it expressly states that "$0" was appropriated.

¶27    The circuit court erred in concluding otherwise. It viewed Act 19, Act 20, and Act 100 as "one piece of legislation," reasoning that "the legislature impose[d] an artificial construct on these three pieces of legislation by treating them as distinct." It observed the interrelated nature of these bills: Act 20 created a statewide literacy program, Act 19 allocated money for the literacy coaching program by appropriating $250 million to JCF, and Act 100 created the accounts and set a sunset date for the program. In the circuit court's view, applying *Finnegan*'s four corners rule would allow the legislature to "balkanize (or hide) the appropriation bill" and "vastly circumscribe the governor's partial veto power granted under the state constitution."

¶28    Neither the circuit court's analysis nor its conclusions can be squared with the original meaning of the governor's partial veto authority under Article V, Section 10(1)(b) of the Wisconsin Constitution. As we explained in *Finnegan*, the four corners of the bill itself must actually appropriate the funds. *Finnegan*, 220 Wis. at 148. The constitution gives the governor authority to veto in part only appropriation *bills*—not bills that are closely related to appropriation bills. WIS. CONST. ART. V, §10(1)(b). The circuit court's approach would expand the "four corners" test into some form of "interlocking bills" test, transferring power to the governor the constitution never vested in the executive. The circuit court suggested no guiding structure or analytical framework beyond an "I know it when I see it" test to determine whether a combination of bills are interrelated enough to render all involved "appropriation bills." This approach departs from the constitution's text and, contrary to our admonition in *Risser*, would prompt affected parties to "continually call[] upon [the judiciary] to resolve conflicts between the other two branches." *Risser*, 207 Wis. 2d at 202. Regardless, we cannot "giv[e] a distorted meaning to the term

'appropriation bill'" or undo the legislature's choices in structuring this trio of bills. *Finnegan*, 220 Wis. at 149.

¶29    The circuit court's conclusion also does not account for this court's suggestion decades ago that the legislature ought to separate bills in this manner to avert a partial veto. We said, "if the legislature wants to insulate its initiatives from the governor's partial veto, it should make sure that it submits its policy legislation as individual, general bills, and not include such enactments in the budget bill." *State ex rel. Wis. Senate v. Thompson*, 144 Wis. 2d 429, 455, 424 N.W.2d 385 (1988). Just this term, the court reiterated the separation of legislation from appropriation bills as a method of avoiding a gubernatorial veto: "Legislators may draft bills separate from appropriation bills to avoid the governor's partial veto. And, legislators may anticipate the governor's use of [this] power when crafting appropriation bills." *LeMieux*, 415 Wis. 2d 422, ¶29. Although the executive branch may be frustrated by constitutional limits on the governor's power to veto non-appropriation bills, the judiciary must respect the People's choice to impose them. This court has no authority to interfere with the legislature's choices to structure legislation in a manner designed to insulate non-appropriation bills from the governor's exercise of the partial veto power.

¶30    DPI and the governor deviate from the circuit court's rationale in their arguments before this court. The executive branch argues that our post-*Finnegan* precedent established a two-part definition of "appropriation," and a bill satisfying either part is sufficient to qualify. Specifically, DPI and the governor contend *Kleczka* and *Risser* established a two-part "in and out" test: (1) setting aside money for a specific object (the "in"); and (2) authorizing executive officers of the state to spend it (the "out"). They rely on *Kleczka*'s description of an appropriation as "setting aside from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other.'" 82 Wis. 2d at 689 (quoting *Hunt*, 257 P. at 649). The executive branch then reads *Risser* to create two independent parts of an appropriation in describing an appropriation bill as either "authoriz[ing] an expenditure *or* the setting aside of public funds for a particular purpose." *Risser*, 207 Wis. 2d at 193 (emphasis added). DPI and the governor highlight *Risser*'s use of "or," which they claim is disjunctive. Under this argument, the executive branch says the spending authorization in S.B. 971 satisfies the "out" portion of its definition by authorizing the executive to spend funds allocated by the corresponding "in" portion of Act 19.

¶31     Neither the constitution nor our cases support the bifurcated definition the executive branch constructs by isolating particular sentences from each decision. DPI and the governor pull those sentences from *Kleczka's* recitation of the definitions on which *Finnegan* relied in ascertaining the meaning of an appropriation bill under Article V, Section 10 of the Wisconsin Constitution. *Kleczka*, 82 Wis. 2d at 689. *Kleczka,* however, used "setting aside money" interchangeably with "authorizing the executive to spend the money" to conclude "the bill as it went to the Governor authorized the expenditure of public moneys. The bill set apart a portion of the public funds for a public purpose—the financing of election campaigns. This meets the definition of an appropriation bill as set forth in [*Finnegan*]." *Id.* at 688–89.

¶32     *Risser* repeated the same analysis as *Kleczka.* After reciting the same definitions from *Finnegan*, *Risser* reiterated that "[u]nder each definition, an appropriation involves an expenditure or setting aside of public funds for a particular purpose." *Risser*, 207 Wis. 2d at 193. Contrary to the argument advanced by the governor and DPI, the authorization of an expenditure is not separable from the setting aside of money for purposes of a bill qualifying as an appropriation. Their insupportable reading would revamp the well-established meaning of an appropriation bill. As we have repeatedly held, in order to qualify as an appropriation bill, the bill must contain within its four corners a setting aside of public money for a public purpose. *See Kleczka*, 82 Wis. 2d at 688–89.

¶33     Because S.B. 971 was not an appropriation bill, the governor had no constitutional authority to partially veto it. We therefore do not address the legislature's alternative argument that the governor improperly exercised his partial veto authority to create a new law that never passed the legislature. *See Walworth State Bank v. Abbey Springs Condo. Ass'n, Inc.*, 2016 WI 30, ¶13 n.7, 368 Wis. 2d 72, 878 N.W.2d 170 (quoting *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Typically, an appellate court should decide cases on the narrowest possible grounds. Issues that are not dispositive need not be addressed.")). The legislature made that argument in case this court concluded S.B. 971 was an appropriation bill. Our holding that S.B. 971 was not an appropriation bill disposes of the legislature's alternative challenge to the governor's exercise of the partial veto power.

¶34     Because the governor's partial veto was unconstitutional, S.B. 971 as passed by the legislature is the law. Upon declaring the governor's veto invalid, we have repeatedly affirmed the general rule that a bill the

legislature passed and presented to the governor is in force as if the governor never vetoed it. *See* WIS. CONST. ART. V, § 10(3) ("Any bill not returned by the governor within 6 days (Sundays excepted) after it shall have been presented to the governor shall be law unless the legislature, by final adjournment, prevents the bill's return, in which case it shall not be law."); *Finnegan*, 220 Wis. at 149 ("[in this case,] the partial veto being ineffective as a veto and no approval being required, the law is in force."); *State ex rel. Sundby v. Adamany*, 71 Wis. 2d 118, 125, 237 N.W.2d 910 (1976) ("If, in fact, the partial vetoes are invalid, the secretary of state has a mandatory duty to publish those sections of the enactment as if they had not been vetoed."); *Bartlett,* 393 Wis. 2d 172, ¶9 (per curiam) ("Relief is granted such that the portions of the enrolled bills that were vetoed are in full force and effect as drafted by the legislature."). Accordingly, S.B. 971 in its original form is the law as if it had never been partially vetoed.

### B. JCF'S DISPOSITION OF DPI'S SUPPLEMENTAL FUNDING REQUESTS.

¶35 DPI and the governor contend JCF improperly denied DPI's request for the remainder of the $50 million earmarked for literacy programs. The executive branch argues, "[w]hether under WIS. STAT. § 13.101(7) or equitable remedial principles, once the invalid JCF roadblock is removed, the money should be delivered where the Legislature meant for it to go: to DPI, to pay for Act 20." More specifically, DPI says "[t]he Governor should therefore be able to direct that money to be transferred to DPI for that purpose." Elsewhere in its briefing, DPI says "[t]his court should order the transfer of the remaining [$50 million, less the money already transferred] to DPI's appropriation . . . ." The executive branch contends "Wisconsin's budget process treats money reserved for executive branch agencies through JCF budget motions as incorporated into the budget bill[,]" and "the disputed $50 million . . . 'should 'be considered to be made' without being subject to JCF's discretion." Regardless of how we would resolve the executive branch's statutory or constitutional claims, this court lacks any legal basis to override the legislature's appropriation to JCF and transfer it to DPI or anyone else.

¶36 DPI and the governor do not identify any legal authority permitting this court to unilaterally change an appropriation to JCF into an appropriation to DPI. Even if they were correct that appropriating money to JCF is unlawful, no remedy under law entitles DPI to receive it instead. We affirm the circuit court's holding that JCF did not improperly withhold funds from DPI.

¶37 The executive branch acknowledges the legislature appropriated $50 million to JCF's supplemental account under WIS. STAT. § 20.865(4)(a) as an earmarked portion of more than $250 million appropriated to that account under Act 19. Nevertheless, DPI and the governor point to JCF budget motion #103—which earmarked funds for the literacy program—and a Legislative Fiscal Bureau (LFB) summary of Act 19 to show the legislature intended the money for DPI. At oral argument, counsel for the legislature agreed JCF expected the money would be spent on the literacy programs and intended to transfer those funds to DPI, but the governor's improper partial veto of Act 100 disrupted the plan.[6]

¶38 Fatal to the executive branch's argument, none of the materials cited by DPI and the governor constitute the law, and each reflect only what the legislature may have intended. The motion "capture[s] the intentions of the governor and the legislature in budget deliberations"[7] but was not enacted into law—nor was the LFB summary. "Ours is 'a government of laws not men,' and 'it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated.'" *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶52, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting ANTONIN SCALIA, A MATTER OF INTERPRETATION 17 (1997)). "It is the *law* that governs, not the intent of the lawgiver . . . . Men may intend what they will; but it is only the laws that they enact which bind us." *Id.* (quoting SCALIA, *supra*, at 17).

¶39 Turning to statutory law, DPI and the governor argue JCF cannot satisfy the prerequisites of WIS. STAT. § 13.101(3)[8] and WIS. STAT.

---

[6] Oral argument in *Legislature v. DPI*, No. 2024AP1713, held Apr. 3, 2025, available on Wisconsin Eye, https://wiseye.org/2025/04/03/wisconsin-supreme-court-wisconsin-state-legislature-v-wisconsin-department-of-public-instruction/ (Argument of Attorney Ryan Walsh at 43:30).

[7] *See* Champagne & Kasper, *Wisconsin Executive Budget Bills, 1931–2023*, *supra*, at 2 (electronic copy available at https://docs.legis.wisconsin.gov/misc/lrb/lrb_reports/executive_budget_bills_2023_7_8.pdf).

[8] **(3)**

**(a)** The committee may supplement, from the appropriations under s. 20.865 (4), the appropriation of any department, board, commission or agency,

§ 20.865(4)(a)[9] empowering JCF to exercise discretion over the $50 million in funds. WISCONSIN STAT. § 13.101(3)(a) provides three conditions under which JCF may exercise its discretion to supplement appropriations made directly to an agency with funds appropriated under WIS. STAT. § 20.865(4)(a) to the JCF supplemental account. If funds appropriated to an agency are "insufficient because of unforeseen emergencies or insufficient to accomplish the purpose for which [they are] made," JCF has discretion to supplement provided (1) an emergency exists; (2) no funds are available for such purposes; and (3) the purposes have been authorized or directed by the legislature. WIS. STAT. § 13.101(3)(a)1.–3.

¶40    The executive branch contends JCF cannot satisfy the statutory conditions, so JCF *must* transfer the funds to DPI. This argument, however, presupposes DPI's entitlement to the funds based on sources extrinsic to the law itself ostensibly showing legislative "intent," such as the earmarking motion and the LFB report noting that earmark. Because the legislature appropriated the funds to JCF, however, only JCF possesses a

---

which is insufficient because of unforeseen emergencies or insufficient to accomplish the purpose for which made, if the committee finds that:

  **1.** An emergency exists;
  **2.** No funds are available for such purposes; and
  **3.** The purposes for which a supplemental appropriation is requested have been authorized or directed by the legislature.

WIS. STAT. § 13.101(3).

[9] **(4) Joint committee on finance supplemental appropriations**. There is appropriated to the joint committee on finance:

**(a) General purpose revenue funds general program supplementation**. Biennially, the amounts in the schedule to be used to supplement appropriations of the general fund which prove insufficient because of unforeseen emergencies or which prove insufficient to accomplish the purposes for which made, to be used to make loans to appropriations from the general or any segregated fund as provided in s. 13.101 (4m) and miscellaneous expense of the joint committee on finance not to exceed $250 . . .

WIS. STAT. § 20.865(4)(a).

legal claim to the money. The executive branch fails to identify any actual law entitling DPI to money appropriated to another entity.

¶41     Even if, as DPI and the governor argue, the legislature improperly manufactured "unforeseen emergencies" by failing to fund the literacy programs in order to give JCF discretion under WIS. STAT. § 13.101(3) to withhold funds from DPI, the law does not entitle DPI to receive the money instead. If the executive branch is correct that no actual emergency exists and JCF therefore lacks any discretion to supplement DPI's appropriation with money from JCF's supplemental account, then JCF does not have discretion to transfer any money to DPI at all. Answering this question would be a purely academic exercise not undertaken by courts; even if we were to agree with the executive branch's analysis, it affords DPI no relief.

¶42     Relying on WIS. STAT. § 13.101(7),[10] DPI and the governor next argue that JCF's discretion over the funds under WIS. STAT. § 13.101(3) is "invalid" and therefore subject to a mandatory "release by the committee" under § 13.101(7). That section says, whenever an appropriation is available "only upon release by the committee" but "the provision relating to release by the committee is invalid, the appropriation or portion of the appropriation which is subject to such release . . . shall be considered to be made without any condition as to time or manner of release." Section 13.101(7), however, would apply only if the appropriation had been made *to DPI* subject to JCF's "release." That section is inapplicable to Act 19's appropriation *to JCF*. JCF's discretionary authority to *supplement* DPI's appropriation is not subject to a "release by the committee" because the $50 million appropriation was not made to DPI.

---

[10] Section 13.101(7) provides in full as follows: "Whenever in the statutes an appropriation or a portion of an appropriation is available only upon release by the [joint] committee [on finance], such moneys shall be made available by the committee at such times and in such amounts as the committee may determine to be necessary to adequately provide for the purposes for which they are appropriated, with due regard for the whole amount available for such purposes. If the provision relating to release by the committee is invalid, the appropriation or portion of the appropriation which is subject to such release shall not be invalidated but shall be considered to be made without any condition as to time or manner of release."

¶43 Alternatively, DPI and the governor challenge the constitutionality of WIS. STAT. § 13.101(3) and WIS. STAT. § 20.865(4)(a), arguing the legislature improperly gave JCF its appropriation power in violation of Article VIII, Section 2 of the Wisconsin Constitution, which requires appropriations to be made "by law." For the same reason we do not resolve their statutory arguments, we decline to consider the constitutionality of those statutes. DPI has no valid claim to receive the funds under any theory of law. Answering this question would amount to nothing more than an advisory opinion; even if the executive branch's constitutional challenge were successful, it affords DPI no relief. *See Choinsky v. Emps. Ins. Co. of Wausau*, 2020 WI 13, ¶28 n.10, 390 Wis. 2d 209, 938 N.W.2d 548 (quoting *Tammi v. Porsche Cars N. Am., Inc.*, 2009 WI 83, ¶3, 320 Wis. 2d 45, 768 N.W.2d 783 ("Courts will not render merely advisory opinions.")).

¶44 Finally, the executive branch urges this court to apply "equitable remedial principles" and exercise its inherent authority to declare the governor may order JCF to give the money to DPI. Neither equitable principles nor our inherent authority empower this court to override the legislature's policy choices in appropriating money to JCF. The people of Wisconsin vested the legislature with the exclusive power to appropriate. Article VIII, Section 2 of the Wisconsin Constitution says, "[n]o money shall be paid out of the treasury except in pursuance of an appropriation by law." Because the judiciary may not make the law, it may not appropriate money to anyone, nor order a different appropriation than what the law provides.

## IV. CONCLUSION

¶45 The Wisconsin Constitution controls the resolution of this dispute between the political branches of government. Under Article V, Section 10(1)(b), the governor impermissibly exercised his partial veto power by vetoing in part a non-appropriation bill. The constitution confines the governor's partial veto authority to appropriation bills. Under Article VIII, Section 2, appropriations may be made only by law, and the legislature appropriated the money DPI seeks to JCF. This court has no constitutional authority to override the legislature's choice and appropriate the money to DPI instead.

*By the Court.*—The judgment and order of the circuit court is affirmed in part and reversed in part.